### THE MARY F. BARRETT.

(District Court, E. D. Pennsylvania. January 20, 1921.)

No. 33.

1. **Shipping ⟪189—"General average" does not apply where necessity for sacrifice was caused by negligence.**
   The doctrine of general average under which the loss caused by a sacrifice made for the common benefit of all should be borne ratably by all does not apply when the necessity for the sacrifice was caused by the negligence of the master or crew.
   [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, General Average.]

2. **Shipping ⟪190—Stranding of vessel held caused by negligence.**
   The stranding of a vessel which necessitated the jettison of part of the cargo and of property belonging to the vessel *held* due to the negligence of the master in navigating the vessel, which was admittedly ten miles off her course in the vicinity of known reefs, either because the master gave a wrong course or because he did not make the proper allowance for the set and strength of the known currents.

3. **Shipping ⟪140—Owners cannot contract against liability for negligence.**
   Before the Harter Act shipowners could not contract to relieve themselves of liability for the negligence of the master or crew, which in law is their negligence.

4. **Shipping ⟪189—Harter Act does not entitle ship to general average for loss resulting from negligence.**
   The Harter Act (Comp. St. §§ 8029–8035), which exempted vessels from liability for losses due to errors of navigation, merely relieved them from liability, but did not entitled them to general average contribution for losses made necessary by errors of navigation.

5. **Shipping ⟪189—Ship cannot invoke general average as defense pro tanto to loss by jettison.**
   In the absence of a stipulation in the charter party entitling the ship to general average contribution for losses made necessary by errors in navigation, which stipulation is authorized under the Harter Act (Comp. St. §§ 8029–8035), the vessel cannot, on a libel for part of the cargo jettisoned because of the stranding of the vessel resulting from errors in navigation, interpose the right to general average as a defense pro tanto.

Sur Motion for Reargument.

6. **Shipping ⟪138—Cause of loss held jettison not negligent stranding.**
   The cause of the loss of part of the cargo which was thrown overboard to lighten the vessel after she had stranded because of errors in navigation was the act of jettison, not the error in navigation which occasioned

---

⟪For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the necessity for it, so that the relief of the Harter Act (Comp. St. §§ 8029–8035) against liability for loss caused by errors in navigation does not apply.

**7. Shipping ⚷189—Full loss of cargo recoverable where proximate cause was jettisoning occasioned by error in navigation.**

The owner of a cargo can recover from the vessel the full value of the portion lost by jettison made necessary by errors of navigation if the charter contained no stipulation entitling the vessel to general average contribution.

In Admiralty. Libel by the American Dyewood Company against the schooner Mary F. Barrett for loss of part of a cargo of logwood. Decree for libelant.

Conlen, Brinton & Acker, of Philadelphia, Pa., for plaintiff.
Howard M. Long, of Philadelphia, Pa., for defendant.

DICKINSON, District Judge. This cause was tried on the theory that there was nothing other than a question of fact involved.

The cause of action which the libel discloses is that the libelant shipped a cargo of logwood by the schooner respondent, a portion of which only was delivered. The libelant makes claim for the value of the part undelivered. The finding is made of the loss as shown by the libelant. The loss was caused by the throwing overboard of the deckload of logwood which the schooner was carrying and about ten tons taken from the hold. This was done to lighten the vessel so as to get her off the reef upon which she had been stranded. Property belonging to the vessel was also thrown overboard for the same purpose.

The defense interposed is that the case is one of general average. This seems to be conceded by the libelant, except as to the shares later mentioned.

[1] The doctrine of general average is the equitable one that the loss caused by a sacrifice made for the common benefit of all should be borne ratably by all. It has no application, however, when the necessity for the sacrifice was caused by the negligence of the master or crew.

[2] The reef on which the schooner was stranded lies north of the west end of the island of Cuba. The account we have of its location and description and whether charted or uncharted is very meager and unsatisfactory. With no thought of perpetrating a bull, if the reef is where the master located it on the chart, it is not there, or the chart is wrong, because he locates it where the chart shows a channel of ample depth. About all that we know of it is that the part on which the schooner struck is very small in area, is located about 28 miles north of San Antonio lighthouse, is so far from the coast as to be out of sight of land, and has over it a depth of water of a little less than 18 feet at low water.

The schooner left a port in Jamaica bound for Chester, Pa. This gave her navigator a choice of routes, one of which would take him to the eastward of Cuba and the other to the westward. He chose the western passage. The presence of reefs in the neighborhood of the one on which the schooner struck is shown on the chart, and are well

known to navigators, and were known to the master of the schooner. The weather conditions were not such as to give trouble. The problem was merely to lay a course around the west end of Cuba, and then far enough north of it to keep clear of the reefs, and to adhere to the course thus laid down. This is what the master attempted to do and thought he had done. To round Cape San Antonio the general course sailed was about north-northwest. The cape was passed with San Antonio lighthouse about 4 miles distant when it bore due east. The wind was free, the schooner then going almost dead before it. The wind kept hauling more and more from the eastward. After the schooner was well clear of the Cape, the course was changed until finally it was by the wind. When she brought upon the reef, she was going close hauled and was headed north-northeast, or within a point of it. As the master admits the schooner was 10 miles out of the course he meant her to have taken, an error in navigation was undoubtedly committed. The error here committed may have been any one or all of several kinds. A wrong course which would take the schooner directly upon the reef may have been given. The first course given may have been changed too soon. The helmsman may not have steered by the courses which were given, or sufficient allowance may not have been made for the set of tides or currents or for leeway made. As the wind was for a good part free and was always from the eastward, drift to leeward could not have been a contributing cause, as all such drift would have been away from danger. As the master himself tells us the courses given were adhered to, we are justified in eliminating this feature, and we are left only a mistake in giving the course or due allowance for the set of the current to explain the mishap. The master attributes the stranding to the latter cause, or to what he calls "the counter current to the Gulf Stream," but, as the current and its variations are given on the charts and were known to him, it was his plain duty to make sufficient allowance for this, and indeed, what he says the set of the current was before he struck the reef and what the chart shows it to be, the set of this current would have taken him away from the reef instead of upon it.

To whatever conclusion the mind might otherwise be led, we do not feel at liberty to make a finding of no negligence in view of the rulings by which we are controlled in Tarabochia v. American Sugar Refining Co. (D. C.) 135 Fed. 424, and Pittsburg & Erie Coal Co. v. George Urban Milling Co., 239 Fed. 271, 152 C. C. A. 259.

In the first of these cases Judge McPherson rejected the theory of the master that the vessel had been carried out of her course by a change in the current due to meteorological disturbances, and found that the error of navigation was that of the helmsmen in not steering by the courses which were given them.

In the latter case the Court of Appeals for the Second Circuit found the error to have been that of the master in not having made sufficient allowance for the strength of a current, the presence and set of which was known to all ordinarily well-informed navigators.

In both of these cases there was a finding of negligence, Judge Hazel, in the latter case, being reversed.

These rulings compel the finding in the instant case that the negligence of the master was the cause of the stranding of the schooner.

Before the passage of the Harter Act (Comp. St. §§ 8029–8035) the vessel owners would without doubt, under our law, have been answerable for the loss, and in all jurisdictions would have been so answerable in the absence of a charter party stipulation otherwise.

[3] The law has been long established in this country that shipowners cannot contract themselves out of liability for the negligence of the master or crew, which in law is their negligence. This is on grounds of public policy. In many other jurisdictions they might so contract. A disadvantage to American shipowners was thought to result. This was the occasion for the passage of the act. Instead of making a simple change of the law in this respect, however. this policy of the law was reasserted in the early sections of the act, and by the third section shipowners who were without negligence in the conditioning, equipping, and manning of their vessels (and we find the owners of the respondent schooner to have complied with this condition) were absolutely exempted from all liability for losses due. inter alia, to "perils of the sea" or "errors of navigation." There was no qualification in case the error was due to negligence. How does this act leave the shipowner with respect to the right to have the case considered one of general average?

It may be premised that the right of the cargo owner to recover for lost cargo rests upon an entirely different basis, and has a wholly different origin from that of the right to general average. The first is contractual or springs from a duty arising out of a contractual relation; the second, as already stated, rests upon purely equitable considerations, backed perhaps by a policy of the law.

[4] The view first taken of the effect of the Harter Act was to place the shipowner, in cases of stranded vessels (no matter what the cause of the stranding), in the place of an innocent victim of a catastrophe. and to give him all the rights to contribution in general average for sacrifice made. Chrystal v. Flint (D. C.) 82 Fed. 472.

In reversing this ruling, however, the Supreme Court laid down a different doctrine, holding that all the act did was to relieve the shipowner from liability under certain conditions, but not to give him anything. The Irrawaddy, 171 U. S. 187, 18 Sup. Ct. 831, 43 L. Ed. 130.

This ruling was at first, in its turn, likewise misinterpreted as meaning that the Harter Act had no application if the stranding was due to the negligence of the master or crew. This was on the ground that such negligence was in law the negligence of the owners.

This misapprehension of the Irrawaddy Case was corrected by the Supreme Court in the very fully argued and well-considered case of The Jason, 225 U. S. 32, 32 Sup. Ct. 560, 56 L. Ed. 969.

It was there pointed out that the Irrawaddy Case simply answered a certified question to the effect that without a charter party stipulation vessel owners could not have the sacrifice they had made enter into a general average computation, and the ruling as a precedent was limited to this proposition.

In the Jason Case there was a charter party provision that the shipowners should share with the cargo owners fully in the benefits of a general average, and the court held that the charter party was in this respect controlling. This was upon the ground that the Harter Act worked such a change that it was no longer the policy of the law to prohibit contracts giving rights to shipowners in respect to losses embraced in the third section, and that they might now stipulate in respect thereto.

The court adhered, however, to the ruling in the Irrawaddy Case that the act did not of itself give the right holding that it simply permitted the parties to so contract, or, at least, it was held that the Irrawaddy Case (in which there was no stipulation) was not in conflict with the allowance of the right to a general average in a case in which there was such a stipulation.

We do not feel at liberty to speculate whether this means a return to the doctrine not accepted by the majority opinion in the Irrawaddy Case and an approval of the doctrine advocated by a minority of the court.

In the instant case there is no charter party stipulation, and a finding of negligence and of the liability of the schooner and a denial of the right to the benefits of a general average apportionment of loss follows in accordance with these rulings.

This renders it unnecessary to go into the question of the liability in any event of that share in the vessel which belongs to the master and whether his negligence differentiates his case from that of the other owners, as was held in The Humarock (D. C.) 234 Fed. 716. The ruling in this case assumes the exemption of the shipowners other than the master who was found to have been guilty of negligence. Although decided after the above cases, the opinion does not refer to them.

The proper ruling of the questions involved in the present cause depends upon the acceptance or rejection of the following propositions:

(1) Before the Harter Act the ship was liable to the cargo owner for loss of cargo due to an error of navigation. This liability was based upon the contract of safe carriage or upon the tort which sprang from the failure of the duty which arose out of the contractual relation of owner and carrier.

(2) There was also a right to and correlative duty of contribution to repair a loss due to the voluntary sacrifice of property for the common benefit of all exposed to a common danger. Ship and cargo owner had the like right and owed the like duty, but the right did not belong to one to whose negligence the necessity for the sacrifice was due.

(3) The effect of the Harter Act was not of itself to make of shipowners innocent parties to the stranding of their ship caused by the negligence of master or crew so as to make of the sacrifice of property in order to save ship and cargo a case of general average.

(4) The effect of the act was, however, to make it permissible for the parties to contract that the doctrine of general average should apply in the event of the sacrifice of property to save ship and cargo in case of a stranding due to an error of navigation, even if the error was the result of negligence.

[5] It follows from the acceptance of these propositions that the right to invoke the law of general average is a defense pro tanto if there is a stipulation in the charter party to this effect, but in the absence of such a contract there is no such right if the loss was due to the negligence of master or crew. A further consequence is that in a libel to enforce the liability of a ship for failure to deliver a part of the cargo, although the shipowners may, of course, interpose the defense that the loss was caused by a peril of the sea or error of navigation, they cannot excuse nondelivery because the missing cargo was thrown overboard, even if it was sacrificed to save the ship and the remaining cargo from destruction, if the danger averted was in turn due to the negligence of the master.

In a very substantial, although not in the strictly literal, sense, this makes shipowners answerable for errors of navigation (if the errors are due to negligence) and permits them to agree themselves out of the consequences of such negligence, at least pro tanto, notwithstanding the fact that upon certain conditions (which in the instant case were fully met) the third section of the Harter Act exempts them from all liability for the consequences of errors without qualification, and the earlier sections forbid them to contract against liability for negligence. As already observed, the act was at first read as one absolving shipowners from liability for the consequences of such errors (although due to negligence), and placing them in the relation of innocent parties to the loss incurred, and because of this making the sacrifice of property to avert further loss a case of general average.

This is evidently the view taken by the District Court (Brown, J.) in the Irrawaddy Case, and also by the dissenting minority of the Supreme Court when the decree of the District Court was reversed.

Under the adjudged cases cited we see no escape from the conclusion that the necessity for the sacrifice of the part of this cargo which was not delivered arose out of a dangerous situation resulting from the negligence of the master, which was in law the negligence of the shipowners, and that the defense that the case is one of general average must be denied them.

Proctors for libelant do not dispute the right of the other owners to successfully set up the defense that this case is one of general average, if the share of the vessel belonging to the master is held to be answerable for the loss. This seems to be due to the opinion which, for some reason, they entertain that the libelant will be paid in full if the share of the master in the vessel is held to be answerable to them.

With findings of the amount of the loss, of negligence, and a denial of the defense of general average thus made by the court, the parties can doubtless agree upon a form of decree in accordance with this opinion. Leave is granted to submit a draft of such decree; we retaining control of the cause to make a decree in case the parties do not agree.

### Sur Motion for Reargument.

All the questions involved in this cause were fully discussed on this motion. In denying it, we have been asked to develop more at length the line of thought which has led us to the conclusion reached.

A reconsideration of these conclusions is justified, not by the circumstance, neither unusual nor surprising, that the respondent thinks the decree is for too large a sum, but by the other circumstance, which is somewhat unusual, that the libelant shares in this opinion.

The proctors concerned have argued these questions with entire frankness, as well as notable ability. The frankness is induced by the fact that the general principle of maritime law involved is of more importance to the clients than the sum recovered.

We accede to the request to file a supplemental opinion, but, as the cause has so many phases and its legal merits may be viewed along so many different angles that an adequate discussion of all of them would be well-nigh interminable, we will restrict the further discussion to the questions which are controlling.

As a beginning, the discussion will be limited to the broad question of the measure of liability of shipowners for a partial loss of cargo where the cargo lost was sacrificed to save ship and remaining cargo from a stranding due to the negligence of the master. It is agreed on all hands that the cargo owners may recover a ratable contribution, but the narrower question is: May they recover their full loss or damage notwithstanding the Harter Act?

There is also agreement that the ship cannot be held responsible for errors or faults in navigation, etc., by the very terms of the act.

[6] The first subsidiary question, then, with which we are confronted, is whether a sacrifice rendered necessary by a stranding, which in turn was due to an error in navigation, is a loss resulting from such error. The stranding undoubtedly directly, and therefore proximately, resulted from the error, but did the loss of cargo so result in view of the fact that there was an independent intervening cause, to wit, the voluntary act of the ship in throwing the cargo overboard? There may, of course, be cases in which the error of navigation is the efficient proximate cause of a loss of cargo because the loss immediately and directly or otherwise consequentially follows the stranding without any other or intervening cause, but here there is an independent intervening cause in the voluntary act of the ship. To those trained to the methods of procedure, modes of thought, and forms of expression of the common-law lawyers the same question above raised may be presented more clearly in another way.

[7]. A prima facie legal cause of action is established by proof of a contract of carriage, acceptance of the cargo, and nondelivery. A legal defense, under the third section of the Harter Act, is made out, if it be shown that the proximate cause of the loss was an error or fault in navigation. Here the common law and the law maritime are in accord so far as the substantive law is concerned. If, however, an independent intervening cause of loss is shown in the act of the ship in throwing the cargo overboard, and this is the proximate cause of the damage done, the damage does not, in the legal sense, result from any error of navigation, and, because it does not, the Harter Act has no application, and the legal defense fails. There is, however, a doctrine or principle of the law maritime known as the law of general average contributions. Out of it, to avoid circuity of actions, there

arises an equitable defense which in any jurisdiction in which equitable defenses are admitted is a good defense pro tanto to any action against a party who has the right to invoke it. There is, however, another doctrine or principle of the law maritime, or rather a qualification of the law of general average contributions, that it cannot be invoked by any one to whose negligence the occasion for the sacrifice was due, and for that reason cannot be invoked by shipowners in stranding cases, if the stranding was due to the negligence of the master or crew, unless there is (as is now permitted) a charter party stipulation which gives the ship the benefit of the right.

Our conclusion is that the proximate cause of the loss of cargo was not any error in navigation, but the throwing of the cargo overboard.

It follows that the only defense to the action to recover the loss is the right of the ship to a contribution from the cargo owners to help meet this loss, and, in the absence of a charter party stipulation for the allowance of this right, the defense fails, and the libelant is entitled to recover its whole loss undiminished by any general average contribution.

It only remains to inquire whether the cases in which the Harter Act has been construed give support to this line of reasoning. Of these cases, it is sufficient to cite Chrystal v. Flint (D. C.) 82 Fed. 472; Tarabochia v. American Sugar Refining Co. (D. C.) 135 Fed. 424; The Irrawaddy, 171 U. S. 187, 18 Sup. Ct. 831, 43 L. Ed. 130; The Jason, 225 U. S. 32, 32 Sup. Ct. 560, 56 L. Ed. 969.

It is true that in none of these cases was the libel based upon the contract of carriage in the sense in which a common-law action would have been brought for nondelivery of a part of the cargo. In every case the cargo owner was asserting his right or resisting the like claim of the ship to contribution under the law of general average.

We do not see, however, that this difference between those cases and the instant case affects the principle laid down or the construction there given to the Harter Act.

It is also true that in every one of the cited cases the cargo owners were claiming less than that to which they would have been entitled in accordance with the conclusions we have reached, nor is there any direct intimation that they were entitled to more. We think, however, that this moderated claim was made because of the wrong construction at first given to the Harter Act, and that there was no ruling that cargo owners were entitled to more because no question of their right to more was raised.

The construction which at first was given to the Harter Act up to and including Chrystal v. Flint was that after the act the negligence of master or crew manifested in some error or fault in navigation was no longer the negligence of the shipowners. It followed from this that the shipowners were thereafter deemed to be innocent parties to a stranding, although due to the negligence of master or crew, so that cargo and ship owners had the like reciprocal right to and duty of making contribution by way of general average.

This established the corollary that all to which the cargo owner was entitled was this right of general average.

270 F.—40

The argument which supported this view is admitted to have been one of much strength. It is so well and fully set forth in the dissenting opinion in the Irrawaddy Case and in the opinion of Judge Brown in Chrystal v. Flint that any attempted restatement of it would weaken it.

There is small wonder that it was generally accepted by the admiralty bar, and was attacked only in respect to its allowance of the claim of the shipowner for reimbursement for his losses.

We cannot, however, now accept this view of the effect of the Harter Act, because this is the very view which the majority opinion in the Irrawaddy Case (which reversed Chrystal v. Flint) refused to accept. We are taught by the Irrawaddy Case that the Harter Act of itself conferred no rights whatever upon shipowners, except inferentially the right to contract in case of negligence (which before they could not do) for the right to a general average contribution, and that all which the act of itself did was to relieve the ship under certain circumstances of a liability which before existed.

In the absence of a contract, therefore, the doctrine of general average contributions was left as it was before, and it could not be invoked by the shipowners in case of a stranding due to the negligence of the master or crew, although this negligence was manifested in a fault in navigation. The shipowners were in consequence denied the right to put their sacrifices in hotchpotch.

The Jason Case (in which there was a contract) merely emphasizes the grounds of the ruling in the Irrawaddy Case, and makes clear the change in the policy of the law in respect to contracts for a general average.

The Irrawaddy and other cases were cases of a claim by the ship to pro tanto recoup itself for the sacrifice it had made. None of them involved the question of the obligation of the cargo owner to bear part of his own loss by way of contribution. There is here, of course, a difference, but we see in principle no distinction. The rule seems to go to the full length that a party whose negligence has caused a danger to arise, and is thus responsible for the necessity of a sacrifice to avert it, cannot claim any measure of relief by way of any contribution from an innocent party.

Some of the cases employ a verbiage which suggests the distinction, but it will be found that this verbiage was used not to note the distinction, but to fit the facts of the case ruled.

These cases and the text-books which deal with the question are cited in Chrystal v. Flint (D. C.) 82 Fed. 472. Lownes, at page 32 et seq. (5th Ed.), makes the general doctrine clear.

This opinion has already reached such length that we cannot consider the several objections urged to giving to the Harter Act the effect given to it by these cases. It is enough to know that it has been so construed.

All the objections now urged without doubt received full consideration when the rulings were made.

The argument addressed to us (for which the Strathdon Case [D. C.] 94 Fed. 206, and the Jason Case are cited) has no support in either of these cases except so far as they are based upon the doctrine in Chrystal v. Flint, which was repudiated by the Supreme Court.

The chief objection to the ruling made is that in effect it renders the Harter Act inoperative. As the argument which backs this objection is based upon the proposition that the error in navigation was the proximate cause of the loss of cargo, and the argument which supports the ruling is based upon the opposing proposition that the jettison (not the error in navigation) was such proximate cause, the acceptance of the view of the shipowners has this curious result. It is the shipowners' view which kills the Harter Act, and the ruling to which they object which keeps it alive. This is true because, if the error in navigation was the proximate cause of the loss, such loss resulted from the error, and the Harter Act applies. If it applies, it operates to relieve the shipowners of all liability for the loss, and yet, in the same view, the shipowners are liable pro tanto for this very loss; in other words, although in one breath it is said the shipowners are not liable for any part of the loss, in the next breath it is said they are liable. It is the Harter Act which says they shall not be liable. To hold them liable may well be said as a consequence to in effect repeal that act. On the other hand, under the doctrine of the Irrawaddy and Jason Cases (on which the ruling made is based), the proposition that, as the error in navigation was not the proximate cause of the cargo loss, the damage was not the "result" of any fault of navigation, and in consequence the Harter Act does not apply so as to operate to relieve the shipowners of liability for such loss cannot be said to nullify the act, but, on the contrary, leaves it free to operate (as the Jason Case holds it does operate) to change the policy of the law in respect to stipulations for the benefit of the doctrine of contributions by way of general average.

Reargument refused.